# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WISCONSIN

In re:                                          Chapter 13

Jakki Campbell,
fka Jacquelyn L. Simmons,                        Case No. 14-25926-mdm
                              Debtor.

---

## MOTION OF THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF THE CWABS, INC., ASSET-BACKED CERTIFICATES, SERIES 2006-24 FOR ABANDONMENT AND RELIEF FROM THE AUTOMATIC STAY

---

The Bank of New York Mellon fka The Bank of New York, as Trustee for the Certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-24, its successors, and/or assignees (hereinafter collectively, and at all times material hereto, "the movant"), by its attorneys, Cummisford, Acevedo & Associates, LLC, moves the court for an order granting relief from the automatic stay pursuant to §362(d) of the Bankruptcy Code and abandonment pursuant to §554(b) of the Bankruptcy Code, and, in support of said motion, alleges as follows:

      1.     That the movant holds a note evidencing debt and mortgage encumbering real property owned by the debtor, Jakki Campbell, and located at 2540 N. 14th St, Milwaukee, Wisconsin 53206 (hereinafter, the "property"). A copy of the supplemental declaration, affidavit in support of motion for relief from the automatic stay, post-petition payment ledger, debtor's schedule D, loan modification agreement, note, mortgage, assignment of mortgage and limited power of attorney are attached hereto, and their contents are incorporated herein by reference.

**Drafted by:**
Michael Acevedo
Cummisford, Acevedo & Associates, LLC
7071 S. 13th Street, Suite 100
Oak Creek, WI 53154
Phone:    414-761-1700
Fax:      414-761-3550

1

2. Specialized Loan Servicing LLC services the loan on the property referenced in this Motion. In the event the automatic stay in this case is modified, this case dismisses, and/or the debtor obtains a discharge and a foreclosure action is commenced on the mortgaged property, the foreclosure will be conducted in the name of Movant or Movant's successor or assignee. Movant, directly or through an agent, has possession of the Note. The Note is either made payable to Movant or has been duly endorsed. Movant is the original mortgagee or beneficiary or the assignee of the Mortgage/Deed of Trust.

3. That monthly post-petition mortgage payments have not been made as required by the terms of the note. The debtor is post-petition past due as of September 17, 2015, and the total post-petition arrearage is as follows:

| Ten (10) mortgage payments at $850.57 each: (December 2014 through September 2015) | $ 8,505.70 |
|---|---|
| Less debtor's suspense balance: | $  (816.83) |
| Total post-petition arrearage: | $  7,688.87 |

4. That the debtor's failure to make these monthly payments constitutes a material default under the note, and said default constitutes "cause" for terminating the automatic stay under §362(d) of the Bankruptcy Code.

5. That the failure to make the monthly payments has resulted in a loss of protection of the movant's interest in the encumbered property, thereby entitling the movant to relief from and termination of the automatic stay under §362(d)(1) of the Bankruptcy Code.

6. That according to the debtor's schedule D, the estimated value of the subject property is $24,200.00.

2

7.     That as of September 17, 2015, the unpaid principal balance on the mortgage loan due the movant is $62,165.47, which when added to the amounts due for accrued delinquent interest, escrow advances, attorneys' fees and costs, equals a total debt owed of approximately $110,330.61. Accordingly, the debtor may have no equity in the property.

8.     That the allegations of the foregoing paragraphs indicate that the property is burdensome and of inconsequential value and benefit to the bankruptcy estate. The trustee should be ordered to abandon the estate's interest, if any, in the property pursuant to §554(b) of the Bankruptcy Code.

9.     That the fourteen (14) day stay pursuant to Federal Rule of Bankruptcy Procedure 4001(a)(3) should be waived.

10.     That the movant requests that the Court deem the provisions of Federal Rule of Bankruptcy Procedure 3002.1 inapplicable to the movant upon entry of an order lifting the automatic stay and the movant withdrawing any applicable proofs of claim.

WHEREFORE, the movant requests that the automatic stay as it pertains to the debtors and the encumbered real property be terminated pursuant to §362(d) of the Bankruptcy Code so that the movant may protect, exercise and enforce its rights pursuant to said note and mortgage, that the trustee be ordered to abandon the estate's interest in the property pursuant to §554(b) of the Bankruptcy Code, that the provisions of Federal Rule of Bankruptcy Procedure 3002(1) be waived and deemed inapplicable to the movant upon the Court signing a relief order, that any order entered pursuant to this motion shall be effective immediately upon its entry and for such further relief as may be just and equitable.

Dated at Oak Creek, Wisconsin this 15th day of October, 2015.

Cummisford, Acevedo & Associates, LLC
Attorneys for The Bank of New York
Mellon fka The Bank of New York, as
Trustee for the Certificateholders of the
CWABS, Inc., Asset-Backed Certificates,
Series 2006-24.

/s/ Michael Acevedo

Michael Acevedo, #1022634

Pursuant to the Fair Debt Collections Practices Act (15 U.S.C. Section 1692), we are required to state that we are attempting to collect a debt on our client's behalf, and any information we obtain will be used for that purpose.

## SUPPLEMENTAL DECLARATION IN SUPPORT OF MOTION FOR RELIEF FROM STAY

I, _____ **Michael R. Blunt** _____ hereby state the following:

1. Specialized Loan Servicing LLC, as servicing agent for The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., ASSET-BACKED CERTIFICATES, SERIES 2006-24 ("Movant") and its successors and/or assigns, is authorized to sue on its own behalf.

2. I am an employee of Specialized Loan Servicing LLC and duly authorized representative of Movant and hereby make this declaration in such capacity. All facts recited herein are within my personal knowledge of all records concerning the account with Debtor(s) and are true and correct.

3. In the course of my employment, I have become familiar with the manner and method in which Specialized Loan Servicing LLC maintains its books and records in its regular course of business. Those books and records are managed by employees and agents whose duty it is to keep the books and records accurately and completely and to record each event or item at or near the time of the event or item so noted.

4. I am familiar with the books and records related to the Note secured by Mortgage/Deed of Trust of even date therewith covering certain real property located at 2540 N 14th St, Milwaukee, Wisconsin 53206, and more particularly described in the Mortgage/Deed of Trust.

5. Note and/or Mortgage/Deed of Trust, Loan Number xxxxxx3933, in the original principal amount of $56,000.00, dated October 25, 2006 was executed by the Original Mortgagor(s): Jakki Campbell to America's Wholesale Lender.

6. Debtor(s) are in default on their obligations to Movant in that Debtor(s) have failed to make their installment payments when due and owing pursuant to the terms of the above-described Note and/or Mortgage/Deed of Trust.

7. As of the date of filing of this case, the pre-petition arrears were $47,420.38. As of September 17, 2015, per the Trustee Ledger, no disbursements have been made.

8. As of September 17, 2015, the unpaid principal balance was $62,165.47. Debtor(s) are due 10 post-petition payments, totaling: $8,505.70.

| Number of Missed Payments | From | To | Missed Principal & Interest | Missed Escrow (If Applicable) | Monthly Payment Amount | Total Amounts Missed |
|---|---|---|---|---|---|---|
| 10 | 12/01/2014 | 09/01/2015 | $557.81 | $292.76 | $850.57 | $8,505.70 |

SUPPLEMENTAL DECLARATION IN SUPPORT
OF MOTION FOR RELIEF FROM STAY

SuppDecSLS0001
4122-N-0612

9. As of September 17, 2015, there are unpaid post-petition fees and costs incurred less than 180 days ago in the amount of $0.00 due and owing that have not been Noticed under Rule 3002.1(c).

| Date Assessed | Description of Fee | Amount |
|---|---|---|
| N/A | N/A | N/A |

10. As of September 17, 2015, the total post-petition delinquency is $7,688.87, which includes a credit of the suspense balance of $816.83.

11. By failing to make the regular monthly installment payments due pursuant to the Note and/or Mortgage/Deed of Trust, Debtor(s) have not provided adequate protection to Movant.

12. Movant has had to retain counsel to represent it before this Court and is incurring legal expenses and attorneys' fees for which it is entitled to reimbursement under the terms of the Note.

13. Further, according to the Debtor(s) schedules, the estimated value of the subject property is $24,200.00. Thus, after full satisfaction of the indebtedness due to Movant under the terms of the Note there is no equity in the property.

I declare that the foregoing facts are true and correct to the best of my knowledge.

**Specialized Loan Servicing LLC, as servicing agent for The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., ASSET-BACKED CERTIFICATES, SERIES 2006-24**

14-25926-MDM

By: _____
   Michael R. Blunt
   A Duly Authorized Representative

**Second Assistant Vice President**

| Creditor: | Specialized Loan Servicing LLC |
|---|---|
| Debtor: | Jakki Campbell |
| Case No.: | 14-25926 |
| Loan No.: | xxxxxx3933 |
| Our File No.: | 4122-N-0612 |
| Collateral: | 2540 N. 14th St., Milwaukee, Wisconsin 53206 |

**PAYMENTS RECEIVED**

Loan Status as of: 9/17/2015
Initial Due Date: 6/1/2014

| Date Received | Amount Received | Due Date | Amount Due | NSF/Late Charges/Other | Paid Over/Short | Description |
|---|---|---|---|---|---|---|
|  | $ - | 6/1/2014 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
|  | $ - | 7/1/2014 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
| 7/24/2014 | $ 845.75 |  | $ | $ | - | $ | 845.75 Funds Received |
|  | $ - | 8/1/2014 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
| 8/18/2014 | $ 845.75 |  | $ | $ | - | $ | 845.75 Funds Received |
|  | $ - | 9/1/2014 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
| 9/15/2014 | $ 845.75 |  | $ | $ | - | $ | 845.75 Funds Received |
|  | $ - | 10/1/2014 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
|  | $ - | 11/1/2014 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
| 11/13/2014 | $ 845.75 |  | $ | $ | - | $ | 845.75 Funds Received |
| 11/25/2014 | $ 845.75 |  | $ | $ | - | $ | 845.75 Funds Received |
|  | $ - | 12/1/2014 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
|  | $ - | 1/1/2015 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
| 1/6/2015 | $ 845.75 |  | $ | $ | - | $ | 845.75 Funds Received |
|  | $ - | 2/1/2015 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
| 2/6/2015 | $ 845.75 |  | $ | $ | - | $ | 845.75 Funds Received |
|  | $ - | 3/1/2015 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
|  | $ - | 4/1/2015 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
|  | $ - | 5/1/2015 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |
|  | $ - | 6/1/2015 | $ 850.57 | $ | - | $ | (850.57) Payment Accrued |

| | | | | | | |
|---|---|---|---|---|---|---|
| $ - | 7/1/2015 | $ 850.57 | $ - | (850.57) | Payment Accrued |
| $ - | 8/1/2015 | $ 850.57 | $ - | (850.57) | Payment Accrued |
| $ - | 9/1/2015 | $ 850.57 | $ - | (850.57) | Payment Accrued |
| Total: | $ 5,920.25 | $ 13,609.12 | $ - | (7,688.87) | |

| Delinquent Payments | | Days Delinquent: | | 311 |
|---|---|---|---|---|
| Month Due | P&I Due | Escrow Due | Stip Due | Total Due |
| 12/1/2014 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 1/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 2/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 3/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 4/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 5/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 6/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 7/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 8/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 9/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| | | | $ | |
| Delinquency | | | | $ 8,505.70 |
| Less Suspense | | | | $ 816.83 |
| Total Delinquency | | | | $ 7,688.87 |

# Claim Detail

NATIONAL DATA CENTER

Case Number: 1425926
Case Status: Active

Debtor1 Name: Jakki Campbell
Debtor2 Name:

Trustee Name: Mary Grossman
Trustee City: Milwaukee, WI

## CLAIM DETAIL

| | |
|---|---|
| Claim Number | 0020 |
| Claim Description | SECURED |
| Claim Type Code | S |
| Class Type Description | Secured |
| Class Type Code | S |
| Level | 98 |
| Comment | 240 N 14TH ST; MM - DIRECT |
| Account Number | |
| Reference Number | |
| UCI | |
| Claim Start Payment Date | |
| Court Claim Number | |
| Percent Paid | |
| Mortgage Due Date | |
| Final Report Category | PRIMARY RESIDENCE |
| Claim Status Description | Direct Pay |

## CLAIM AMOUNTS

| | |
|---|---|
| Claim Amount | $47,420.38 |
| Scheduled Amount | $0.00 |
| Monthly Payment | $0.00 |
| Max Pay Amount | $47,420.38 |
| Collateral Value Amount | $24,200.00 |
| Principal Paid | $0.00 |
| Principal Owed | $0.00 |
| Principal Due Amount | $0.00 |
| Interest Rate % | 0.0000 |
| Interest Paid | $0.00 |
| Interest Due Amount | $0.00 |
| Trustee Percent | 5.2000 |

## CREDITOR INFORMATION

| | |
|---|---|
| Creditor Name | SPECIALIZED LOAN SERVICING LLC |
| Mailing Address | PO BOX 636007 |
| | LITTELTON, CO 80163 |
| Contact Name | |
| Phone Number | (800) 315-4757 |
| Creditor Number | |

## FLAGS

| | |
|---|---|
| No Check Indicator | O |
| Stop Disburse Indicator | Y |
| Continuing Indicator | N |
| Reserve Indicator | |

## Payment History

### CUSTOMER CLAIM TAG

Payment Type          Claim Identifier:          Comment:

| DATE | CHECK NUMBER | NAME OF PARTY | DESCRIPTION | PAYMENT AMOUNT | TOTAL |
|---|---|---|---|---|---|

No records to display.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

IN RE:

: CHAPTER 13

:

Jakki Campbell,
fka Jacquelyn L. Simmons
          Debtor(s).

: CASE NO. 14-25926-mdm

:

---

### AFFIDAVIT OF Michael R. Blunt IN SUPPORT OF MOTION
### BY SPECIALIZED LOAN SERVICING LLC, AS SERVICING AGENT FOR
### THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK,
### AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF THE CWABS, INC.,
### ASSET-BACKED CERTIFICATES, SERIES 2006-24 FOR RELIEF
### FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(D)

---

STATE OF ____**Colorado**____ )
                        ) ss

COUNTY OF ____**Douglas**____ )

   **Michael R. Blunt**

I, _____, being duly sworn, deposes and states as follows:

    1.    I am over the age of eighteen and am authorized to make this affidavit on behalf of Specialized Loan Servicing LLC, as servicing agent for The Bank of New York Mellon fka The Bank of New York, as Trustee for the Certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-24.

                        **Second Assistant Vice President**
    2.    I am presently a _____ for Specialized Loan Servicing LLC. In this position, I have access to the business records of Specialized Loan Servicing LLC, and my responsibilities include ascertaining and verifying amounts due and payable as to delinquent bankruptcy accounts.

    3.    The facts stated in this affidavit are based upon information that I obtained by reviewing records maintained in the ordinary course of Specialized Loan Servicing LLC business, as part of regularly conducted business activity, by or from information transmitted by person(s) with knowledge of the events described therein, at or near the time of the event described.

    4.    Jakki Campbell executed a Note dated October 25, 2006 in favor of America's Wholesale Lender in the original principal sum of $56,000.00 (**the "Note"**).

    5.    Specialized Loan Servicing LLC is the servicer of the loan. The note is held by The Bank of New York Mellon fka The Bank of New York, as Trustee for the Certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-24.

    6.    The Note is secured by a Mortgage encumbering certain real property commonly known as 2540 N 14th St, Milwaukee, WI 53206-2515.

AFFIDAVIT IN SUPPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY

7.    The unpaid principal balance of this loan as of September 17, 2015 is $62,165.47. The accrued interest is $32,876.62.

8.    The variable interest rate on the mortgage loan is 9.990%.

9.    The post-petition arrearage due as of September 17, 2015 is itemized as follows:

| | |
|---|---|
| Ten (10) mortgage payments at $850.57 each: (December 2014 through September 2015) | $ 8,505.70 |
| Less debtor's suspense balance: | $ (816.83) |
| Total post-petition arrearage: | $ 7,688.87 |

10.    Attached hereto as **Exhibit "A"** and incorporated herein by reference is a summary of the Debtor's post-petition payment history since the post-petition mortgage payments were last current.

11.    Upon information and belief, the real property has an estimated value of $24,200.00 based upon the debtor's schedule. Attached as **Exhibit "B"** is the Schedule D.

12.    The sums set forth in this affidavit do not include any late charges, escrow advances, attorneys' fees, costs, or other fees and charges that might otherwise be included in the event that a payoff is requested or provided.

13.    The Loan Modification Agreement, Note, Mortgage, Assignments, and Limited Power of Attorney, if any, are attached hereto as **Exhibit "C"** and are true and redacted copies of the originals.

**I declare under penalty of perjury that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct.**

AFFIANT        Michael R. Blunt

State of Colorado
County of Douglas

The foregoing instrument was acknowledged before me this    October 9, 2015    by
(Date)
**Michael R. Blunt    Second Assistant Vice President** Specialized Loan Servicing LLC, a Delaware
(Name, Title)
Limited Liability Company, on behalf of the LLC.

(Notary's official Signature)

03/11/2018
(Commission Expiration)

RANIA ELKHATIB
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20104009024
**MY COMMISSION EXPIRES 03/11/2018**

AFFIDAVIT IN SUPPORT OF MOTION FOR RELIEF FROM AUTOMATIC STAY

| Creditor: | Specialized Loan Servicing LLC |
|---|---|
| Debtor: | Jakki Campbell |
| Case No.: | 14-25926 |
| Loan No.: | xxxxxx3933 |
| Our File No.: | 4122-N-0612 |
| Collateral: | 2540 N. 14th St., Milwaukee, Wisconsin 53206 |

**PAYMENTS RECEIVED**

Loan Status as of: 9/17/2015
Initial Due Date: 6/1/2014

| Date Received | Amount Received | Due Date | Amount Due | NSF/Late Charges/Other | Paid Over/Short | Description |
|---|---|---|---|---|---|---|
| | $ - | 6/1/2014 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| 7/27/2014 | 845.75 | 7/1/2014 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | | | | | 845.75 | Funds Received |
| 8/18/2014 | 845.75 | 8/1/2014 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | | | | | 845.75 | Funds Received |
| 9/15/2014 | 845.75 | 9/1/2014 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | | | | | 845.75 | Funds Received |
| | - | 10/1/2014 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| 11/13/2014 | 845.75 | 11/1/2014 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | | | | | 845.75 | Funds Received |
| 11/25/2014 | 845.75 | 12/1/2014 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | | | | | 845.75 | Funds Received |
| 1/6/2015 | 845.75 | 1/1/2015 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | | | | | 845.75 | Funds Received |
| 2/6/2015 | 845.75 | 2/1/2015 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | | | | | 845.75 | Funds Received |
| | - | 3/1/2015 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | - | 4/1/2015 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | - | 5/1/2015 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | - | 6/1/2015 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | - | 7/1/2015 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | - | 8/1/2015 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| | - | 9/1/2015 | $ 850.57 | $ - | | (850.57) Payment Accrued |
| **Total:** | **$ 5,920.25** | | **$ 13,609.12** | **$ -** | **(7,688.87)** | |

**Delinquent Payments**  Days Delinquent: 290

| Month Due | P&I Due | Escrow Due | Stp Due | Total Due |
|---|---|---|---|---|
| 12/1/2014 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 1/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 2/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 3/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 4/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 5/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 6/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 7/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 8/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| 9/1/2015 | $ 557.81 | $ 292.76 | $ - | $ 850.57 |
| Delinquency | | | $ | 8,505.70 |
| Less Suspense | | | $ | 816.83 |
| Total Delinquency | | | $ | 7,688.87 |

EXHIBIT A

B6D (Official Form 6D) (12/07)

In re __Jakki Campbell__ , Case No. _____
_____
Debtor

# SCHEDULE D - CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and last four digits of any account number of all entities holding claims secured by property of the debtor as of the date of filing of the petition. The complete account number of any account the debtor has with the creditor is useful to the trustee and the creditor and may be provided if the debtor chooses to do so. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests.

List creditors in alphabetical order to the extent practicable. If a minor child is a creditor, the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m). If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor" ,include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether the husband, wife, both of them, or the marital community may be liable on each claim by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community".

If the claim is contingent, place an "X" in the column labeled "Contingent". If the claim is unliquidated, place an "X" in the column labeled "Unliquidated". If the claim is disputed, place an "X" in the column labeled "Disputed". (You may need to place an "X" in more than one of these three columns.)

Total the columns labeled "Amount of Claim Without Deducting Value of Collateral" and "Unsecured Portion, if Any" in the boxes labeled "Total(s)" on the last sheet of the completed schedule. Report the total from the column labeled "Amount of Claim" also on the Summary of Schedules and, if the debtor is an individual with primarily consumer debts, report the total from the column labeled "Unsecured Portion" on the Statistical Summary of Certain Liabilities and Related Data.

☐   Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| CREDITOR'S NAME AND MAILING ADDRESS INCLUDING ZIP CODE, AND ACCOUNT NUMBER (See instructions above.) | C O D E B T O R | H W J C | DATE CLAIM WAS INCURRED, NATURE OF LIEN, AND DESCRIPTION AND VALUE OF PROPERTY SUBJECT TO LIEN | C O N T I N G E N T | U N L I Q U I D A T E D | D I S P U T E D | AMOUNT OF CLAIM WITHOUT DEDUCTING VALUE OF COLLATERAL | UNSECURED PORTION, IF ANY |
|---|---|---|---|---|---|---|---|---|
| Account No. | | | homestead located at 2540 N 14th St, Milwaukee, WI 53206 valued according to property tax bill Sadie Cannon, deceased Grandmother is listed on the title | | | | | |
| **SLS** **8742 Lucent Boulevard Suite 300** **Littleton, CO 80129** | | - | | | | | | |
| | | | Value $             24,200.00 | | | | 62,550.46 | 38,350.46 |
| Account No. | | | | | | | | |
| | | | | | | | | |
| | | | Value $ | | | | | |
| Account No. | | | | | | | | |
| | | | | | | | | |
| | | | Value $ | | | | | |
| Account No. | | | | | | | | |
| | | | | | | | | |
| | | | Value $ | | | | | |

**0**   continuation sheets attached

| | Subtotal (Total of this page) | 62,550.46 | 38,350.46 |
|---|---|---|---|
| | Total (Report on Summary of Schedules) | 62,550.46 | 38,350.46 |

*EXHIBIT B*

RECORDING REQUESTED BY:
Countrywide Home Loans Servicing LP
Attn. WORKOUT DEPARTMENT, LAN-70
177 COUNTRYWIDE WAY
LANCASTER, CA 93536'

Loan #: ▮▮▮▮▮▮▮

-------------------------------------------------------------------FOR INTERNAL USE ONLY-----------------------------------------------------------------

# LOAN MODIFICATION AGREEMENT

### (Adjustable Interest Rate)

This Loan Modification Agreement ("Agreement"), made this 24th day of December 2007, between JAKKI CAMPBELL, and Countrywide Home Loans Servicing LP (Lender), amends and supplements (1) the Mortgage, Deed of Trust, or Deed to Secure Debt (the Security Instrument), dated the 25th day of October 2006 and in the amount of $56,000.00 and (2) the Note bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as in the 'Property', located at 2540 N 14TH ST, MILWAUKEE, WI 53206.

The real property described being set forth as follows:

### SAME AS IN SAID SECURITY INSTRUMENT

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (not withstanding anything to the contrary contained in the Note or Security Instrument):

1. As of the 1st day of March 2008, the amount payable under the Note or Security Instrument (the "Unpaid Principal Balance") is U.S. $63,717.72 consisting of the amount(s) loaned to the borrower by Lender and any interest capitalized to date.

2. The Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of the Lender. Interest will be charged on the Unpaid Principal Balance from the 1st day of February 2008. The Borrower promises to make monthly payments of principal and interest of U.S. $562.67 beginning on the 1st day of March 2008. The interest rate and monthly payment will adjust in accordance with the Note, Adjustable Rate Rider and any other loan document that is affixed to or incorporated into the Note and Rider and provides for, implements or relates to any change or adjustment in the interest rate and monthly payment amount under the Note. If on the 1st day of November 2036 (the "Maturity Date"), the Borrower still owes amounts under the Note and Security Instrument, as amended by this Agreement, the Borrower will pay these amounts in full on the Maturity Date.

3. The Borrower will make such payments at 450 American Street, Simi Valley, California 93065 or at such other place as the Lender may require.

4. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in the Borrower is sold or transferred and the Borrower is not a natural person) without the Lender's prior consent, the Lender may, at it's option, require immediate payment in full of all sums secured by this Security Instrument.

   If the Lender exercises this option, the Lender shall give the Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by this Security Instrument. If the Borrower fails to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on the Borrower.

5. The Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, the Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that the Borrower is obligated to make under the Security Instrument.

CHLP Loan# ▮▮▮▮▮▮▮                    Page 1 of 2

EXHIBIT
C

6. Nothing in this agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and the Borrower and Lender will be bound by, and comply with, all terms and provisions thereof, as amended by this Agreement.

7. In consideration of this Modification, Borrower agrees that if any document related to the Security Instrument, Note and/or Modification is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan, or is otherwise missing upon the request of the Lender, Borrower(s) will comply with Lender's request to execute acknowledge, initial and deliver to Lender any documentation Lender deems necessary to replace or correct the lost misplaced, misstated, inaccurate or otherwise missing document(s). If the original promissory note is replaced the Lender hereby indemnifies the Borrower(s) against any loss associated with a demand on the original note. All documents Lender requests of borrower(s) shall be referred to as Documents. Borrower agrees to deliver the Documents within ten (10) days after receipt by Borrower(s) of a written request for such replacement.

As evidenced by their signatures below, the Borrower and the Lender agree to the foregoing.

_JAKKI CAMPBELL_        Dated _1-25-09_

STATE OF _Wisconsin_

COUNTY OF _Milwaukee_

On _25th Day_ before me, _Jakki Campbell_

Notary Public, personally appeared _Jackie P Campbell_

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person (s) whose name (s) is/are subscribed to the within instrument and acknowledged me that he/she/they executed the same in his/her/their authorized capacity (ies), and that by his/her/their signatues (s) on the instrument the person (s), or entity upon behalf of which the person (s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

Countrywide Home Loans Servicing LP

By: _____      Dated _2/14/08_

*(Notary seal: ROBIN TALBOTT, NOTARY PUBLIC, STATE OF WISCONSIN)*

CHLP Loan# ▮▮▮▮▮▮        Page 2 of 2



# ADJUSTABLE RATE NOTE
(LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

OCTOBER 25, 2006                     BROOKFIELD                          ILLINOIS
     [Date]                            [City]                             [State]

2540 N 14TH ST, MILWAUKEE, WI 53206-2515
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 56,000.00     (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
AMERICA'S WHOLESALE LENDER
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     9.990 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

Solely for the purpose of computing interest, a monthly payment received by the Note Holder within 30 days prior to or after the date it is due will be deemed to be paid on such due date.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payment on the first     day of each month beginning on
DECEMBER 01, 2006    . I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   NOVEMBER 01, 2036    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 491.03     . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first     day of NOVEMBER, 2008    , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before the Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**WISCONSIN ADJUSTABLE RATE NOTE - LIBOR INDEX - Single Family**
● BC - ARM Note
2D154-WI (12/05)(d)                                            Page 1 of 9




### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX & THREE-QUARTERS percentage point(s) ( 6.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.490 % or less than 9.990 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE & ONE-HALF percentage point(s) ( 1.500 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 16.990 % or less than 9.990 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid Principal is known as a "Full Prepayment." A prepayment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Partial or Full Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payments due under this note.

Subject to the Prepayment Penalty specified below, I may make a Full Prepayment or Partial Prepayments of my obligation. The Note Holder will use all of my prepayments to reduce the amount of Principal that I owe under the Note. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

[X] I may prepay this Note in full at any time without penalty. This always applies if the original loan amount is less than $25,000 or if I do not occupy the home.

[ ] If the original Principal amount of this loan exceeds $25,000 and is secured by a mortgage on a home which I occupy in whole or in part and if within the first _____ months after the execution of the Note, I make any prepayment(s) within any 12-month period, the total of which exceeds 20 percent (20%) of the original Principal amount of this loan, I will pay a prepayment penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds 20 percent (20%) of the original principal amount of the loan.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

Case 14-25926-beh    Doc 37    Filed 10/15/15    Page 17 of 40

LOAN #: ▮▮▮▮▮▮▮▮

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ -Borrower
JAKKI CAMPBELL

_____ -Borrower

_____ -Borrower

_____ -Borrower

*[Sign Original Only]*

PAY TO THE ORDER OF
WITHOUT RECOURSE
COUNTRYWIDE HOME LOANS, INC., A NEW YORK CORPORATION
DOING BUSINESS AS AMERICA'S WHOLESALE LENDER
BY: _____
MICHELE SJOLANDER
EXECUTIVE VICE PRESIDENT

BC - ARM Note
2D154-WI (12/05)                    Page 3 of 3

Case 14-25926-beh    Doc 37    Filed 10/15/15    Page 18 of 40

# MORTGAGE

DOCUMENT NUMBER

NAME & RETURN ADDRESS
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423

PARCEL IDENTIFIER NUMBER

**DOC.# 09341517**

REGISTER'S OFFICE | SS
Milwaukee County, WI|

RECORDED    11/20/2006  08:00AM

JOHN LA FAVE
REGISTER OF DEEDS

AMOUNT:       41.00

——————————— [Space Above This Line For Recording Data] ———————————

[Doc ID #]

MIN

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.

(A) **"Security Instrument"** means this document, which is dated  OCTOBER 25, 2006      , together
with all Riders to this document.
(B) **"Borrower"** is
JAKKI CAMPBELL, AN UNMARRIED WOMAN

Borrower is the mortgagor under this Security Instrument.
(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this
Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) **"Lender"** is
AMERICA'S WHOLESALE LENDER
Lender is a CORPORATION
organized and existing under the laws of NEW YORK                            .
Lender's address is
4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613                    .
(E) **"Note"** means the promissory note signed by Borrower and dated  OCTOBER 25, 2006      . The
Note states that Borrower owes Lender
FIFTY SIX THOUSAND and 00/100

Dollars (U.S. $ 56,000.00          ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  NOVEMBER 01, 2036    .
(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

WISCONSIN--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

Page 1 of 11

VMP® -6A(WI) (0505)      CHL (08/05)(d)   VMP Mortgage Solutions, Inc. (800)521-7291                    **Form 3050 1/01**
CONV/VA

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

COUNTY of MILWAUKEE :
[Type of Recording Jurisdiction]          [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of

2540 N 14TH ST, MILWAUKEE ,
[Street/City]

Wisconsin 53206-2515 ("Property Address"):
[Zip Code]

-6A(WI) (0505)     CHL (08/05)          Page 2 of 11                    Form 3050 1/01

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any

Case 14-25926-beh     Doc 37     Filed 10/15/15     Page 21 of 40

or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying Reasonable Attorneys' Fees (as defined in Section 25) to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

DOC ID #: █████████████

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, Reasonable Attorneys' Fees (as defined in Section 25); property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, Reasonable Attorneys' Fees (as defined in Section 25) and costs of title evidence.**

If Lender invokes the power of sale, Lender shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, Reasonable Attorneys' Fees (as defined in Section 25); (b) to all sums secured by this Security Instrument; and (c) any excess to the clerk of the circuit court of the county in which the sale is held.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Accelerated Redemption Periods.** If the Property is a one- to four-family residence that is owner-occupied at the commencement of a foreclosure, a farm, a church or owned by a tax exempt charitable organization, Borrower agrees to the provisions of Section 846.101 of the Wisconsin Statutes, and as the same may be amended or renumbered from time to time, permitting Lender, upon waiving the right to judgment for deficiency, to hold the foreclosure sale of real estate of 20 acres or less six months after a foreclosure judgment is entered. If the Property is other than a one- to four-family residence that is owner-occupied at the commencement of a foreclosure, a farm, a church, or a tax-exempt charitable organization, Borrower agrees to the provisions of Section 846.103 of the Wisconsin Statutes, and as the same may be amended or renumbered from time to time, permitting Lender, upon waiving the right to judgment for deficiency, to hold the foreclosure sale of real estate three months after a foreclosure judgment is entered.

25. **Attorneys' Fees.** If this Security Instrument is subject to Chapter 428 of the Wisconsin Statutes, "Reasonable Attorneys' Fees" shall mean only those attorneys' fees allowed by that Chapter.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
JARKI CAMPBELL                          -Borrower

_____ (Seal)
                                                    -Borrower

_____ (Seal)
                                                    -Borrower

_____ (Seal)
                                                    -Borrower

DOC ID #: ████████████

**STATE OF WISCONSIN,** Waukesha County ss:
The foregoing instrument was acknowledged before me this 25ᵗʰ day of October,
2006
by Jakki Campbell

My Commission Expires: 9-26-10

Nicole Bruckner
_____
Notary Public, State of Wisconsin

This instrument was prepared by
JOWANNA R. HILL
AMERICA'S WHOLESALE LENDER
2375 N GLENVILLE DR RGV-B-195, RICHARDSON, TX 75082



Exhibit "A"

The West 1/2 of Lot 24 and the West 1/2 of Lot 23, in Plat of 31.12 acres in the Southeast 1/4 of Section 18, Township 7 North, Range 22 East between North Teutonia Avenue and North 14th Street, in the City of Milwaukee, Milwaukee County, State of Wisconsin.

DOC ID #: ▮▮▮▮▮▮▮▮▮

# ADJUSTABLE RATE RIDER
### (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this TWENTY-FIFTH      day of
OCTOBER, 2006      , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the
same date given by the undersigned (the "Borrower") to secure Borrower's Note to
AMERICA'S WHOLESALE LENDER

(the "Lender") of the same date and covering the property described in the Security Instrument and
located at:

2540 N 14TH ST, MILWAUKEE, WI 53206-2515

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**MULTISTATE ADJUSTABLE RATE RIDER - LIBOR INDEX** - Single Family
CONV
• BC - ARM Rider
1U193-US (12/05)(d)                    Page 1 of 4



## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of   9.990 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the  first                day of NOVEMBER, 2008      , and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding SIX & THREE-QUARTERS      percentage point(s) (  6.750 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.490 % or less than    9.990 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE & ONE-HALF percentage point(s) (   1.500 %) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than    16.990 % or less than 9.990 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

CONV
● BC - ARM Rider
1U193-US (12/05)           Page 2 of 4



**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CONV
● BC - ARM Rider
1U193-US (12/05)                    Page 3 of 4

DOC ID #: [REDACTED]

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____(Seal)
JAKKI CAMPBELL                                                    - Borrower

_____(Seal)
                                                                            - Borrower

_____(Seal)
                                                                            - Borrower

_____(Seal)
                                                                            - Borrower

CONV
● BC - ARM Rider
1U193-US (12/05)                      Page 4 of 4

DOC.# 09846687

RECORDED
02/18/2010 08:29AM

JOHN LA FAVE
REGISTER OF DEEDS
Milwaukee County, WI
AMOUNT: $11.00

FEE EXEMPT #: 0
0
***This document has been
electronically recorded and
returned to the submitter.**

STATE BAR OF WISCONSIN FORM 14- 1998
ASSIGNMENT OF MORTGAGE

Document Number

Mortgage Electronic Registration Systems, Inc. as nominee for America's
Wholesale Lender for a valuable consideration assigns to Bank of New York
Mellon f/k/a the Bank of New York, as trustee for the certificateholders
CWABS, Inc., Asset-Backed Certificates, Series 2006-24 the Mortgage
executed by Jakki Campbell to Mortgage Electronic Registration Systems,
Inc. as nominee for America's Wholesale Lender on October 25, 2006 and
recorded in the office of the Register of Deeds of Milwaukee County,
Wisconsin, on November 20, 2006 as Document Number 9341517, together
with the Note and indebtedness it secures.

Recording Area
Name and Return Address

Blommer Peterman S.C.
13700 W. Greenfield Avenue
Brookfield, WI 53005

BAC Home Loans Servicing, L.P. v Campbell

The original principal balance of said Mortgage is $56,000.00

Parcel Identification Number (PIN)

THE WEST 1/2 OF LOT 24 AND THE WEST 1/2 OF LOT 23, IN PLAT OF 31.12 ACRES IN THE
SOUTHEAST 1/4 OF SECTION 18, TOWNSHIP 7 NORTH, RANGE 22 EAST BETWEEN NORTH
TEUTONIA AVENUE AND NORTH 14TH STREET, IN THE CITY OF MILWAUKEE, MILWAUKEE
COUNTY, STATE OF WISCONSIN.

For information purposes only:
Address: 2540 North 14th Street, Milwaukee, WI 53206

This assignment is made without recourse.
(OR) Assignor covenants that there is now owning and unpaid on the note and Mortgage, as principal, a sum of not less
than_____ Dollars, and also interest_____ and that the Assignor is the owner of
the note and mortgage and has good right to assign it.

Dated this ____ day of ___FEB 0 5 2010___ , ____.

Mortgage Electronic Registration Systems, Inc. as
nominee for America's Wholesale Lender

SHELBY JOE BUTLER
Notary Public
STATE OF TEXAS
My Comm. Exp. 02-26-12

*BY:

Sandra Williams, Assist. Vice President

**AUTHENTICATION**

Signature(s) _____

**ACKNOWLEDGMENT**

State of ____Texas____ )
                                    ) ss
County of ____Dallas____ )

Personally came before me this____ day of ___FEB 0 5 2010___
the above named
Sandra Williams, Assist. Vice President

authenticated this _____ day of _____ , _____.

to me known to be the person(s) who executed the
foregoing instrument and acknowledge the same.

Shelby Joe Butler

Notary Public, State of ___Texas___

TITLE: MEMBER STATE BAR OF WISCONSIN

My Commission is permanent.
(If not, state expiration date: __2.26.18__ )

zw their signatures                          *421903*

## LIMITED POWER OF ATTORNEY

Reference is hereby made to (x) each of the pooling and servicing agreements listed in Schedule 1 attached hereto, by and among The Bank of New York Mellon f/k/a The Bank of New York ("BNY Mellon"), as trustee, Countrywide Home Loans Servicing LP, as master servicer, Countrywide Home Loans, Inc., as seller, one or more additional sellers identified therein, and either of CWALT, Inc. or CWABS, Inc. or CWMBS, Inc., as depositor (each, a "Pooling and Servicing Agreement" and collectively, the "Pooling and Servicing Agreements"), and (y) that certain settlement agreement or Settlement (the "Settlement Agreement"), dated as of June 28, 2011, by and among BNY Mellon, in its capacity as trustee or indenture trustee of certain mortgage-securitization trusts identified therein, Bank of America Corporation, Bank of America, N.A., as successor by merger to BAC Home Loans Servicing, LP (f/k/a Countrywide Home Loans Servicing LP) (the "Master Servicer"), Countrywide Financial Corporation and Countrywide Home Loans, Inc. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Pooling and Servicing Agreements or the Settlement Agreement, as the context requires.

BNY Mellon, as Trustee under the Pooling and Servicing Agreements, hereby constitutes and appoints Specialized Loan Servicing, LLC and its authorized officers (collectively, "SLS") and each of them, its true and lawful attorneys-in-fact and agents, with full powers of substitution and resubstitution, for and in its name, place and stead, in any and all capacities, for the limited purpose of executing and recording any and all documents necessary to effect (i) a foreclosure of a Mortgage Loan, (ii) the disposition of an REO Property, (iii) an assumption agreement or modification agreement or supplement to the Mortgage Note, Mortgage, or deed of trust, (iv) defense of the Trustee in litigation and to resolve any litigation where SLS has an obligation to defend the Trustee, including but not limited to dismissal, termination, cancellation, rescission and settlement, which settlement shall release with prejudice all claims and liabilities against BNY Mellon and will not result in admission of guilt by BNY Mellon, (v) title claim resolution, including but not limited to settlement agreements or (vi) a reconveyance, deed of reconveyance or release or satisfaction of mortgage or such instrument releasing the lien of a Mortgage, (vii) the protection, enforcement and/or assignment of BNY Mellon's interest, as Trustee, in a Mortgage Loan, the property secured thereby, or the proceeds related thereto, including but not limited to preparation or execution of documents relating to tax sales, in each case solely in the performance of SLS's duties and obligations in respect of Mortgage Loans that are then being subserviced by SLS pursuant to a subservicing agreement (the "Subservicing Agreement") with the Master Servicer, then in effect in accordance with the terms of the Settlement Agreement. BNY Mellon also grants unto said attorneys-in-fact and agents, and each of them, subject to the foregoing limitations, the full power and authority to correct minor ambiguities and errors in documents necessary to effect items (i), (ii), (iii), (iv), (v), (vi) and (vii) above, BNY Mellon also grants unto said attorneys-in-fact and agents, and each of them, subject to the foregoing limitations, the full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as might or could be done in person to effect items (i), (ii), (iii), (iv), (v), (vi) and (vii) above, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them, or their substitutes, may lawfully do or cause to be done by virtue hereof; provided that this instrument is to be construed and interpreted as a limited power of attorney and does not empower or authorize the said attorneys-in-fact and agents to do any act or execute any document on behalf of BNY Mellon not specifically described herein.

For the purposes of clarification, but not limitation, BNY Mellon grants unto said attorneys-in-fact and agents, and each of them the full power and authority to (x) execute, acknowledge, seal and deliver deeds, deed of trust/mortgage note endorsements, assignments of deed of trust/mortgage and other recorded documents, tax authority notifications and other instruments of sale, conveyance and transfer, full or partial releases and subordinations, each appropriately completed, with all ordinary or necessary endorsements, acknowledgments, affidavits, and supporting documents as may be necessary and proper to effect the execution, delivery, conveyance, recordation or filing of said documents; (y) execute and deliver affidavits of

debt, substitutions of trustee, substitutions of counsel, non-military affidavits, notices of rescission, foreclosure deeds, transfer tax affidavits, affidavits of merit, verifications of complaint, notices to quit, bankruptcy declarations for the purpose of filing motions to lift stays and other documents or notice filings on behalf of the Trustee in connection with foreclosure, bankruptcy and eviction actions; and (z) endorse and/or assign any borrower or Mortgagor's check or negotiable instrument received by SLS as a payment under a Mortgage Loan.

Nothing in this Limited Power of Attorney shall be deemed to amend or modify the Pooling and Servicing Agreements, the Settlement Agreement, the applicable Subservicing Agreement or the respective rights, duties or obligations of SLS thereunder, and nothing herein shall constitute a waiver of any rights or remedies thereunder. Without limiting the generality of the foregoing, this Limited Power of Attorney does not provide, and shall not be read so as to provide, SLS with the power to perform or undertake actions which SLS is not authorized to take pursuant to the applicable Subservicing Agreement or that the Master Servicer is not authorized to take pursuant to the applicable Pooling and Servicing Agreement. In addition, each attorney-in-fact and agent is only authorized to act pursuant to this Limited Power of Attorney in a manner which complies with all applicable laws, rules and regulations.

SLS shall indemnify, defend and hold BNY Mellon and its successors and assigns harmless, from and against any and all losses, costs, expenses (including, without limitation, actual attorneys' fees), damages, liabilities, demands or claims of any kind whatsoever, arising out of, related to or in connection with any misuse of this Limited Power of Attorney in any manner or by any person not expressly authorized hereby. Acceptance of this Limited Power of Attorney by SLS, or the taking by SLS of any action pursuant to this Limited Power of Attorney, shall be deemed an agreement and acceptance by SLS of this indemnity obligation.

The rights, power, and authority of said attorneys-in-fact and agents granted in this Limited Power of Attorney will commence and be in full force and effect on the date of execution and such rights, powers, and authority will remain in full force and effect until the earlier of (x) 11:59 p.m., New York City time, on the date that is 2 year[s] from such date and (y) the date, if any, on which SLS is no longer an "Approved Subservicer" under the Settlement Agreement; provided, however, that BNY Mellon may terminate this Limited Power of Attorney prior to such date by delivering a written notice of revocation to SLS, with a copy to the Master Servicer.

THE BANK OF NEW YORK MELLON F/K/A
THE BANK OF NEW YORK, as Trustee

Witness: _____
Jason Blass

By: _____
Loretta A. Lundberg
Managing Director

Witness: _____
Zhou Ye

By: _____
Gavin Tsang
Vice President

STATE OF: <u>New York</u>
COUNTY OF: <u>New York</u>

On the 3rd day of February in the year 2015 before me, the undersigned, personally appeared Loretta A. Lundberg and Gavin Tsang, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

IN WITNESS THEREOF, I have hereunto set my hand and affixed by official seal the day and year in this certificate first above written.

Notary Public

ALEXANDER PUGLISE
NOTARY PUBLIC, State of New York
No. 01PU6295251
Qualified in New York County
Commission Expires Dec. 30, 2017

**SCHEDULE 1**

List of Pooling and Servicing Agreements

#5001      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-9

#5002      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWALT, Inc., Alternative Loan Trust 2006-OA6 Mortgage Pass-Through Certificates, Series 2006-OA6

#5003      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWALT, Inc., Alternative Loan Trust 2006-OC8 Mortgage Pass-Through Certificates, Series 2006-OC8

#5006      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-12

#5007      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-15

#5008      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-17

#5009      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-18

#5010      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-21

#5011      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-22

#5012      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-24

#5013      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-25

#5014      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-26

#5015      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-7

#5017      The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-1

#5018     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc Asset-Backed Certificates, Series 2007-10

#5019     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-11

#5022     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-3

#5023     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-4

#5024     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-5

#5025     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-6

#5026     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., ASSET Asset-Backed Certificates, Series 2007-7

#5027     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWALT, Inc., Alternative Loan Trust 2006-OA10 Mortgage Pass-Through Certificates, Series 2006-OA10

#5028     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-13

#5029     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-14

#5030     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-20

#5032     The Bank of New York Mellon FKA The Bauk of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-13

#5033     The Bank of New York Mellon FKA The Bank of New York, as Trustee for the certificateholders of the CWABS, Inc., Asset-Backed Certificates, Series 2007-8